**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| EMIRATES, | ) |
| | ) |
| Plaintiff, | ) Case No. _____ |
| | ) |
| v. | ) **JURY TRIAL DEMANDED** |
| | ) |
| ANWAR ASSAF, NAWAL ALDRAIDI, | ) |
| MOHD ASSAF, SABAH SAID, TALA | ) |
| LOGISTICS INCORPORATED, TALA | ) |
| LOGISTIC TRUCKING, and TALA | ) |
| LOGISTIC COMPANY | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

NOW COMES Plaintiff, Emirates (the "Airline" or "Emirates"), by its attorneys, Jane M. McFetridge and J. Casey Leech of Jackson Lewis P.C., and for its Complaint against Defendants Anwar Assaf, Nawal Aldraidi, Mohd Assaf, Sabah Said, Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company (collectively, "Defendants"), states as follows:

## NATURE OF THE ACTION

1.     This case is about Anwar Assaf ("Assaf"), who shamelessly abused the trust and confidence reposed in him by his previous employer, Emirates, for over four years. During his employment with Emirates, Assaf directed that the Airline's accounts payable department remit payments to several cargo services vendors, which (unbeknownst to Emirates) were shell companies that Assaf surreptitiously created, owned, and managed.

2.     This case is also about Assaf's family members—specifically, Assaf's wife, Nawal Aldraidi, Assaf's brother, Mohd Assaf, and Assaf's mother, Sabah Said (together, with Assaf, the "Individual Defendants")—who acted in concert with Assaf to defraud Emirates. Assaf's family members actively participated in his covert scheme by acting as agents of the vendors that

purported to provide services to Emirates; this allowed Assaf to conceal his involvement with the companies and avoid raising suspicions.

3. Integral to the Individual Defendants' conspiracy was the creation of the shell companies that Assaf and his family members owned and operated: Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company (together, the "Corporate Defendants"). Assaf, who was responsible for selecting third party vendors to provide services for Emirates, created the Corporate Defendants, selected them to provide services to Emirates, and approved their invoices for services allegedly performed at prices that grossly exceeded market rates. In turn, the Corporate Defendants contracted with other entities to provide the actual services that Emirates required. The Corporate Defendants were extraneous and unnecessary "middle-men," that served no purpose other than to add layers of cost to the services provided by others—layers of cost that inured solely to the benefit of Assaf and the other Individual Defendants and to the detriment of Emirates.

4. Throughout the four years that Assaf lined his pockets at Emirates' expense, the Defendants submitted over 200 invoices, each of which Assaf—in his capacities as Cargo Supervisor and Cargo Officer—approved for payment. In total, Emirates remitted nearly $350,000 in payments for services purportedly rendered.

5. Every time Emirates paid an invoice, Assaf received the value of the additional inflated costs generated by his scheme, in addition to the salary he received from the Airline, thereby depriving Emirates of its legitimate expectations and benefits to which it was entitled, including the benefit of obtaining vendor services at the lowest available prices. In doing so, Assaf violated his fiduciary obligations to Emirates and exploited his positions of trust and influence for his own personal benefit.

## PARTIES

6.    Plaintiff Emirates is a foreign corporation with its principal place of business in Dubai, United Arab Emirates. The Airline, which engages in interstate commerce, operates in airports around the world, including Chicago's O'Hare International Airport ("O'Hare"). To support its O'Hare cargo operations, Emirates maintains an office at 11601 W. Touhy Ave., Building 893, Chicago, Cook County, Illinois 60666.

7.    Defendant Anwar Assaf is a resident of Illinois, domiciled at 806 S. Grace Street, Lombard, Illinois 60148. From October 1, 2010 until March 19, 2019, Assaf was employed and paid a salary by Emirates. During his employment with Emirates, Assaf worked primarily at O'Hare. Prior to the termination of his employment from Emirates, Assaf held the position of Cargo Officer and supervised other Emirates employees. Assaf founded, owned, and chiefly operated the Corporate Defendants in furtherance of his scheme to defraud Emirates and embezzle its funds.

8.    Defendant Nawal Aldraidi ("Aldraidi") is a resident of Illinois, domiciled at 806 S. Grace Street, Lombard, Illinois 60148. Aldraidi is Assaf's wife. Along with Assaf, Aldraidi is an owner and agent of Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company. Aldraidi acted as a representative of the Corporate Defendants, working under Assaf's direction and control. Aldraidi knew that her involvement with the Corporate Defendants was, in part, to conceal the nature of Assaf's relationship with the Corporate Defendants.

9.    Defendant Mohd Assaf ("Mohd") is a resident of Illinois, domiciled at 806 S. Grace Street, Lombard, Illinois 60148. Mohd is Assaf's brother. Mohd acted as a representative of Tala Logistics Incorporated, working under Assaf's direction and control. Mohd knew that his involvement with Tala Logistics Incorporated and/or the other Corporate Defendants was, in part,

to conceal the nature of Assaf's relationship with Tala Logistics Incorporated and/or the other Corporate Defendants.

10.     Defendant Sabah Said ("Said") is a resident of Illinois, domiciled at 806 S. Grace Street, Lombard, Illinois 60148. Said is Assaf's mother. Said acted as the President of Tala Logistic Company, working under Assaf's direction and control. Said knew that her involvement with Tala Logistic Company and/or the other Corporate Defendants was, in part, to conceal the nature of Assaf's relationship with Tala Logistic Company and/or the other Corporate Defendants.

11.     Defendant Tala Logistics Incorporated in an Illinois corporation with its principal place of business at 1001 Ogden Ave., Suite LL1, Downers Grove, Illinois 60515 and/or 806 S. Grace Street, Lombard, Illinois 60148, the Individual Defendants' home address. On or about June 9, 2017, Aldraidi signed and submitted to Emirates via email a supplier information form indicating she was the contact person for Tala Logistics Inc.

12.     Defendant Tala Logistic Trucking is an unincorporated business with its principal place of business at 806 S. Grace Street, Lombard, Illinois 60148, the Individual Defendants' home address. Assaf and Aldraidi are co-owners and agents of Tala Logistic Trucking. On or about May 15, 2016, Aldraidi signed and submitted to Emirates via email a supplier information form indicating she was the contact person for Tala Logistic Trucking.

13.     Defendant Tala Logistic Company is a dissolved Illinois corporation with its principal place of business at 806 S. Grace Street, Lombard, Illinois 60148 and/or 6S010 Steeple Run Dr., Unit 1D, Naperville, Illinois 60450, Said's previous home address. On or about May 22, 2015, Said signed and submitted to Emirates via email a supplier information form indicating she was the contact person for Tala Logistic Company.

4

## JURISDICTION & VENUE

14.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964 because it arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., a federal law. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because they arise out of a common nucleus of operative fact as the RICO claims.

15.     This Court also maintains original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because Emirates, a citizen of Dubai, United Arab Emirates, is completely diverse from the Defendants, which are all citizens of Illinois, and the amount in controversy exceeds $75,000.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in the Northern District of Illinois. Moreover, venue is proper in this Court pursuant to 18 U.S.C. § 1965 because all of the Individual Defendants are subject to personal jurisdiction in this District and reside in this District.

## FACTUAL BACKGROUND

### Emirates and Its Employment Relationship with Assaf

17.     Emirates is an international airline operating in more than 150 airports around the world, including O'Hare. Emirates SkyCargo is the airfreight division of Emirates.

18.     In a letter to Assaf dated September 15, 2010, Emirates offered to employ Assaf as a Cargo Supervisor for the Airline's SkyCargo operations at O'Hare. A true and accurate copy of this offer letter is attached hereto as Exhibit 1 (the "Offer Letter"). Emirates' offer contained terms regarding Assaf's compensation and allowances, and further provided, in relevant part:

Responsibilities

As a Cargo Supervisor, you will be employed under the direction of the Cargo Manager on duty, and as a representative of Emirates, your responsibilities include, but are not limited to, assisting the Cargo Manager in the attainment of revenue, tonnage and yield targets in accordance with company standards and directives, and to perform other associated duties as directed by Emirates SkyCargo management. Emirates, in its sole discretion, may alter your duties from time to time.

. . . .

At Will Employment

Emirates will employ you on an 'at will' basis. As a result, your employment will not be for a specific period of time, and either you or Emirates may terminate your employment at any time and for any reason, with or without cause, and with or without notice. Any statements to the contrary that may have been made to you, by Emirates or its agents are superseded by this letter, and nothing in this letter or its attachments or in any Emirates policy, procedure or document (including, but not limited to the Emirates Employment Regulations Manual) is to be construed as a contract of employment for any specific length of time or for anything other than an 'at will' employment relationship. Although your job duties, title, compensation and benefits, as well as Emirates' employment practices, policies and procedures, may change from time to time as determined by Emirates, the 'at will' nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of Emirates.

. . . .

Confidentiality

By accepting this offer of employment, you agree, both during and after your employment, not to disclose any confidential information of Emirates and it subsidiaries and affiliates gained during your employment. You will also be required to sign a statement that you have not brought and will not bring any proprietary information of any former employer with you.

Acceptance

This letter supersedes any previous discussions, offers and/or prior agreements of understandings. If you decide to accept this offer of employment, please sign and date below and return the countersigned letter to me no later than October 01, 2020.

Exhibit 1.

19.     On September 27, 2010, Assaf accepted Emirates' offer by signing and dating the declaration at the bottom of the Offer Letter, explicitly "agree[ing] and accept[ing] the offer of employment on the terms described." *Id*.

20. On October 1, 2010, Assaf commenced his employment as Cargo Supervisor.

21. On June 1, 2015, Emirates promoted Assaf to Cargo Officer. In the letter sent to Assaf confirming this promotion, Emirates specified Assaf's promotion date, job grade, new base salary, location of position location, and supervisor, and indicated that "[a]part from the above, all other terms and conditions of employment will remain unchanged." A true and accurate copy of this promotion letter is attached hereto as Exhibit 2 (the "Promotion Letter").

22. As Cargo Officer, Assaf oversaw Emirates' day-to-day cargo operations at O'Hare; his responsibilities included, but were not limited to: (a) ensuring Emirates' operations were conducted efficiently, cost-effectively, and in compliance with all applicable laws, regulations, and Airline policies; (b) leading the O'Hare SkyCargo team in accordance with established Emirates SkyCargo procedures; (c) identifying opportunities for cost reduction; (d) planning, organizing, and coordinating the operational activities conducted by Emirates SkyCargo employees, O'Hare ground handling agents, and third party vendors; (e) utilizing and managing third party vendors to provide products and services at the lowest available prices; (f) negotiating pricing with vendors, including investigating and challenging costs if necessary; (g) approving invoices submitted by third party vendors; (h) supervising cargo operations to ensure all activities are completed safely and efficiently; and (i) adhering to Emirates' policies and procedures, including its Employment Regulations Manual. A true and accurate copy of the Cargo Officer job description, which lists some of these responsibilities, is attached hereto as Exhibit 3.

23. As Cargo Supervisor and Cargo Officer, Assaf was a supervisory employee entrusted to exercise his discretion and independent authority to the benefit of Emirates. As such, he owed Emirates a heightened duty of loyalty, above and beyond the duty owed by Emirates'

rank-and-file employees. Throughout Assaf's employment, Emirates was entitled to Assaf's undivided loyalty and utmost good faith.

24.     The total amount of compensation that Assaf received during his employment with Emirates exceeded $836,000.

25.     In or about February of 2019, Emirates discovered several discrepancies in invoices submitted by Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company. Specifically, it appeared that many of the invoices submitted by the Corporate Defendants contained inaccurate tax rates, charges for services that greatly exceeded market price, and other unusual characteristics.

26.     After conducting a preliminary investigation into Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company, Emirates discovered that these vendors appeared to be owned by, managed by, or otherwise associated with Assaf, Aldraidi, and/or Assaf's other family members.

27.     On March 15, 2019, Assaf met with Jannie Davel, Emirates' Vice President of Cargo Commercial – Americas, Wasan Alhusseiny, Emirates' Head of Human Resources – Americas, and Rajeev Munjal – Emirates' Regional Accounting Manager, at the Airlines' offices in New York City.

28.     At the March 15, 2019 meeting, Davel, Alhusseiny, and Munjal confronted Assaf regarding his use of the Corporate Defendants as cargo service vendors at O'Hare. Specifically, Davel, Alhusseiny, and Munjal questioned Assaf about the fact that Tala Logistics Incorporated appeared to be owned by Assaf and/or Aldraidi, that its principal place of business was Assaf's home address, and that the invoices submitted by Tala Logistics Incorporated and/or the other

Corporate Defendants contained tax rate inconsistencies and prices higher than the actual market rate for the services purportedly rendered.

29.     At first, Assaf contended that Aldraidi merely worked for Tala Logistics Incorporated. Later in the meeting, Assaf admitted that Aldraidi was, in fact, the owner of Tala Logistics Incorporated.

30.     Assaf, however, failed to provide any meaningful explanation regarding the unusual circumstances surrounding the invoices from the Corporate Defendants, the nature of his and his family's involvement with the Corporate Defendants, and the services purportedly rendered to Emirates by the Corporate Defendants.

31.     Fifteen minutes into the conversation, backed into a corner and unable to explain his nefarious activities, Assaf abruptly walked out of the meeting—but not before he taunted Davel, Alhusseiny, and Munjal by telling them, "you'll never get your money back."

32.     On March 19, 2019, after concluding that Assaf's conduct deliberately and repeatedly violated his fiduciary and contractual obligations to Emirates (including the policies contained in Emirates' Employment Regulations Manual), Emirates terminated Assaf's employment.

### Emirates' Employment Regulations Manual

33.     Emirates expects that its employees exhibit the highest standards of conduct during their employment with the Airline. In line with this expectation, Emirates maintains its Employment Regulations Manual ("ERM"), which contains an array of policies governing the relationships between Emirates and its employees.

34.     Section C6-1 of the ERM, Emirates' Code of Conduct and Business Ethics, provides that employees are expected to "[a]ct with courtesy, integrity, honesty and

professionalism when dealing with customers, colleagues, suppliers and passengers whether on or

off duty." A true and accurate copy of Section C6-1 of the ERM is attached hereto as Exhibit 4.

Section C6-1 of the ERM further provides, in pertinent part:

1.2 **Employees are prohibited from**

– Using their position and authority to further their personal interests.

. . . .

2. **CONFLICT OF INTEREST**

2.1 Employees should not become involved in any activity that is likely, directly or indirectly to be in conflict with the company's interest.

2.2 Facts or omissions which can or could prejudice, (or be perceived to prejudice), impartiality of decisions made by or on behalf of the company are to be avoided.

2.3 Employees should inform their HR manager, in writing, of any perceived or potential conflicts of interest.

2.4 In general what an employee does while not at work is his/her personal concern, unless those actions affect the employee's performance at work or the reputation of the company.

3. **EXTERNAL EMPLOYMENT AND PROFESSIONAL ACTIVITIES**

3.1 The company's employment contract is based on the underlying principle that the company will be the employee's sole employer. This applies to all permanent full time employees.

Exhibit 4.

35. As discussed more fully below, Assaf violated Section C6-1 of the ERM by: (a)

using his employment at Emirates to further his and his family's personal interests; (b) becoming

involved in the activities of the Corporate Defendants, which directly conflicted with Emirates'

interests; (c) intentionally concealing the fact that he and his family members owned and operated

the Corporate Defendants, thereby prejudicing the impartiality of the decisions he made regarding

Emirates' use of cargo vendors; (d) failing to inform his HR manager (or anyone at Emirates) of the conflict of interest that he created by involving himself in the ownership and operations of the Corporate Defendants; (e) disregarding Emirates' reasonable expectation that the Airline would be Assaf's sole employer; and (f) engaging in clandestine self-dealing to his own personal benefit and contrary to the interests of Emirates, which continued to pay him in return for his supposed best efforts on the Airline's behalf.

36.     Section C6-6 of the ERM, Emirates' Exclusive Service policy, contains additional provisions prohibiting the exact behavior in which Assaf engaged. It provides, in pertinent part:

**1.     GENERAL PRINCIPLES**

1.1     The company's employment contract is based on the underlying principle that the company will be the employee's sole employer. This applies to all permanent full time and part time employees, irrespective of sponsorship.

. . . .

1.2     Employees must not become involved in any activity that is likely, directly or indirectly to be in conflict and competition with the interests of any member company of the Emirates Group. This is particularly to be emphasized in the context of the airline, cargo, airport service and travel industry. Employees who are in any doubt should seek the advice and guidance of their Country Manager or Line Manager.

1.3     It is acknowledged that employees may have business interests outside of their role with the company. Financial investment in another venture and other business interests may be acceptable providing they do not compete with the interests of any member company of the Emirates Group . . . Business interests which would be considered a conflict of interest include involvement in any activity (including sponsoring and/or being a board member of another business venture) where that venture has, or seeks to have, a working relationship with an Emirates Group company. Employees are required to declare any business interests.

1.4     Any business interest of family members which may potentially conflict with an employee's role in the company must also be declared.

. . . .

11

2.    **AVOIDANCE OF CONFLICT OF INTEREST**

2.1    To avoid any actual or perceived conflict of interest employees must:-

a) Declare in writing to their Vice President or Country Manager, with copies to Executive Vice President Human Resources if they or their family members are (or become) involved in the operation of any business venture which may be considered to be a conflict of interest.

And

b) Gain written approval from the company to participate in the venture. Continued involvement without permission may render the employee liable for dismissal.

A true and accurate copy of Section C6-6 of the ERM is attached hereto as Exhibit 5.

37.    As discussed more fully below, Assaf violated Section C6-6 of the ERM by: (a) disregarding Emirates' reasonable expectation that the Airline would be Assaf's sole employer; (b) involving himself in the ownership and operations of the Corporate Defendants, which directly conflicted and competed with the interests of Emirates; (c) maintaining a clandestine business interest in the Corporate Defendants, which had a working relationship with Emirates; (d) intentionally failing to disclose to Emirates his and his family members' business interests in the Corporate Defendants, which directly conflicted with his role at Emirates.

38.    Emirates' ERM, including Sections C6-1 and C6-6 of the ERM, is posted on its intranet portal and is accessible to all Emirates employees. Emirates expects that its employees familiarize themselves with and adhere to the policies contained in the ERM. Moreover, Emirates expects that its employees in supervisory capacities (which included Assaf) advise other employees about the ERM and hold subordinates accountable for compliance with the policies contained in the ERM. Emirates expressed these expectations to Assaf throughout his employment with the Airline.

12

## Assaf's Scheme to Defraud Emirates

39.     Beginning in 2014, Assaf decided to exploit his role as Cargo Supervisor and became the architect of a scheme to defraud Emirates, its customers, and its shareholders. This scheme continued long after Emirates promoted Assaf to Cargo Officer.

40.     Recognizing that, as a matter of course, Emirates' accounts payable department remitted payments for invoices that Assaf approved, Assaf realized that he could submit invoices for services that were purportedly rendered, then receive the invoice payments in addition to the salary that Emirates paid him. Assaf knew that there was little oversight over the invoices he approved, which aided in his ability to embezzle Emirates' funds without being detected.

41.     Assaf was aware that this self-dealing breached his fiduciary and contractual obligations and violated the policies contained in Emirates' ERM, namely, the policies relating to conflicts of interest and outside business ventures.

42.     In furtherance of his fraudulent scheme, Assaf enlisted the help of his family members, Nawal Aldraidi, Mohd Assaf, and Sabah Said. Together, Assaf and his family members created, owned, and operated shell companies that purportedly provided services to Emirates.

43.     Assaf and/or the other Individual Defendants named these companies Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company.

44.     Tala is the name of Assaf's daughter.

45.     Beginning on December 5, 2014 and continuing through February 5, 2019, Assaf approved over 200 invoices—which he and the other Individual Defendants electronically submitted to Emirates—for services purportedly rendered by the Corporate Defendants. Unbeknownst to Emirates, the Individual Defendants then subcontracted these services to third parties, which completed the work. In turn, the Corporate Defendants invoiced Emirates for the

services performed by the third parties. The rates that the Corporate Defendants charged Emirates far exceeded the typical market rate for such services (and upon information and belief, far exceeded what the Individual Defendants paid the third parties).

46.     Each time Assaf approved an invoice submitted by the Corporate Defendants, he made fraudulent misrepresentations to Emirates with the intent that Emirates rely on his misrepresentations. Emirates trusted Assaf to approve legitimate and reasonably priced invoices for services that benefitted the Airline. Assaf knew that Emirates could have obtained the services directly from the vendors that were surreptitiously subcontracted by the Corporate Defendants, and Assaf knew that Corporate Defendants' invoices that he approved included significant markups inuring to his benefit and the benefit of the other Defendants and to Emirates' detriment; nonetheless, Assaf approved the Corporate Defendants' invoices in betrayal of Emirates' trust, and Emirates relied on Assaf's approval before paying the invoices.

47.     In total, Emirates remitted nearly $350,000 for services that were purported to have been provided by the Corporate Defendants. Examples of services for which the Corporate Defendants invoiced Emirates included freight delivery and other cargo services. Attached as Exhibit 6 to this Complaint is a non-exhaustive list of invoices that the Defendants submitted to Emirates—invoices which Emirates paid—in furtherance of their conspiracy to defraud Emirates.

48.     Upon information and belief, throughout the scheme, Assaf disclosed Emirates' confidential information to the other Individual Defendants, including by revealing information relating to Emirates' internal operations, its financial information, and its relationships with third party vendors. Assaf disclosed this confidential information to provide the other Individual Defendants with strategic guidance in furtherance of their conspiracy to defraud Emirates. For example, upon information and belief, Assaf disclosed confidential information relating to the

prices that other third-party vendors charged Emirates, so that the Individual Defendants were better informed when they set the prices for services purportedly performed by the Corporate Defendants.

49.     Upon information and belief, Assaf disclosed Emirates' confidential information through email. Assaf disclosed this and Emirates' other confidential information in violation of the Offer Letter, the Airline's policies, and Assaf's fiduciary duties to Emirates.

50.     To bolster the apparent legitimacy of the Corporate Defendants, on or about August 29, 2014, Assaf and/or the other Individual Defendants incorporated Tala Logistic Company. According to the Illinois Secretary of State's website, Said was Tala Logistic Company's president prior to its dissolution.

51.     To further bolster the apparent legitimacy of the Corporate Defendants, on or about October 21, 2016, Assaf and/or the other Individual Defendants incorporated Tala Logistics Incorporated. According to the Illinois Secretary of State's website, Aldraidi is Tala Logistics Incorporated's registered agent.

52.     At all times since their inception, Assaf has exercised dominion and control over the Corporate Defendants.

53.     During the period that Assaf orchestrated the scheme against Emirates, the total amount of salary and other compensation that he received from the Airline exceeded $526,000.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF RICO, 18 U.S.C. § 1962(c)
### (Asserted Against Defendant Anwar Assaf, Nawal Aldraidi, Mohd Assaf, and Sabah Said)

54.     Emirates realleges Paragraphs 1 through 53 as if fully set forth herein

55.     Pursuant to their common purpose to defraud Emirates over the period of several years, the Individual Defendants associated together to operate the Corporate Defendants. The

Corporate Defendants, taken together, constituted an enterprise whose activities affected interstate commerce. The Individual Defendants did so pursuant to an agreement to participate in the affairs of the enterprise and an agreement to the commission of several acts of wire fraud.

56.     Each of the Individual Defendants intended to and knowingly carried out their unlawful scheme to defraud Emirates, primarily through the use of wires (including by communicating through email); they reasonably foresaw that wires would be used as part of their acts of deceit and fraud, and each of them actually communicated through email to carry out their scheme. Specifically, the wires were used each time the Individual Defendants, acting as agents of the Corporate Defendants, submitted invoices from Illinois via email to Assaf and other Emirates employees (many of whom are located at Emirates' offices in New York and Dubai), and such emails were routed through Emirates' servers in Dubai, in furtherance of their fraudulent scheme. Such invoices were submitted on or about the dates indicated in Exhibit 6. Moreover, the Individual Defendants' use of the wires to perpetrate the fraud involved hundreds—if not thousands—of communications that crossed state lines, including when:

> (a)     Assaf, acting as an agent of Emirates, exchanged email correspondence with Mohd and Aldraidi, who acted as agents of the Corporate Defendants, regarding services that the Corporate Defendants purportedly provided to Emirates. Examples of the dates of such correspondence include, without limitation, May 25, 2016, October 5, 2016, November 5, 2016, April 26, 2017, May 28, 2017, June 23, 2017, December 6, 2017, and February 8, 2018;

(b)     Assaf, from Illinois, emailed invoices he approved to Emirates employees in New York and/or Dubai for payment processing on or about the dates indicated in Exhibit 6;

(c)     As indicated above, Said and Aldraidi signed and submitted to Emirates via email the information forms indicating they were the contact persons for Tala Logistic Company, Tala Logistics Inc., and Tala Logistic Trucking.

(d)     Said caused to be electronically filed all necessary documents to register Tala Logistic Company with the Illinois Secretary of State, listing herself as its president; and

(e)     Aldraidi caused to be electronically filed all necessary documents to register Tala Logistics Incorporated with the Illinois Secretary of State, listing herself as its agent.

57.     In total, Individual Defendants committed no less than 200 distinct but related and continuous acts of interstate wire fraud over a period of over four years. In doing so, they engaged in a pattern of racketeering activity (as defined by 18 U.S.C. § 1961(5)) for the unlawful purpose of intentionally defrauding Emirates.

58.     The Individual Defendants' acts of wire fraud crossed state lines when they sent emails to and from Emirates emails accounts, in part because Emirates' email servers are located in Dubai.

59.     The Individual Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

60. Emirates sustained losses and damages as a direct and proximate result of the Individuals Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c).

WHEREFORE, Emirates respectfully requests that this Court award the following relief against Defendants Anwar Assaf, Nawal Aldraidi, Mohd Assaf, and Sabah Said:

    a.    Judgment in favor of Emirates;

    b.    Compensatory damages, plus interest, in an amount to be determined at trial;

    c.    Treble damages as provided by statute;

    d.    Emirates' costs incurred as a result of having to file this action, including attorneys' fees, costs, and other expenses incurred; and

    e.    Such further relief as this Court may deem just and proper, in law or equity.

**COUNT II: VIOLATION OF RICO, 18 U.S.C. § 1962(d) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(c)**
**(Asserted Against Defendants Anwar Assaf, Nawal Aldraidi, Mohd Assaf, and Sabah Said)**

61. Emirates realleges Paragraphs 1 through 60 as if fully set forth herein.

62. As set forth above, the Individual Defendants agreed and conspired to violate 18 U.S.C. § 1962(c), specifically, by conducting and participating in the conduct of the affairs of the Corporate Defendants, the enterprise through which the Individual Defendants engaged in a pattern of racketeering activity.

63. Each of the Individual Defendants engaged in overt and predicate fraudulent racketeering acts in furtherance of their conspiracy, they knew that their predicate acts of wire fraud were part of an overall pattern of racketeering activity, and they agreed to the commission of those acts to further the scheme against Emirates. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

64.     Emirates sustained losses and damages as a direct and proximate result of the Individuals Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d).

WHEREFORE, Emirates respectfully requests that this Court award the following relief against Defendants Anwar Assaf, Nawal Aldraidi, Mohd Assaf, and Sabah Said:

      a.      Judgment in favor of Emirates;

      b.      Dissolution of Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company;

      c.      Compensatory damages, plus interest, in an amount to be determined at trial;

      d.      Treble damages as provided by statute;

      e.      Emirates' costs incurred as a result of having to file this action, including attorneys' fees, costs, and other expenses incurred; and

      f.      Such further relief as this Court may deem just and proper, in law or equity.

## COUNT III: Common Law Fraud
### (Asserted Against Defendant Anwar Assaf)

65.     Emirates realleges Paragraphs 1 through 53 as if fully set forth herein.

66.     As an Emirates supervisory employee and fiduciary, Assaf had a duty to disclose all material facts relating to his employment with the Airline, including the existence of any potential conflicts of interest and outside business ventures. Assaf's duty to disclose all material facts relating to his employment was even more important because Emirates—who employed Assaf as its O'Hare Cargo Officer (and previously, as its Cargo Supervisor)—reposed in Assaf significant trust and confidence, thereby placing him in a position of influence and superiority over Emirates.

67.     For over four years, Assaf betrayed Emirates' trust and confidence by failing to disclose his outside business ventures and obvious conflicts of interest. That is, Assaf intentionally, repeatedly, and fraudulently concealed the material facts that he and his family members owned and operated the Corporate Defendants, and that the Individual Defendants were financially benefitting from the 200-plus invoices submitted by the Corporate Defendants, approved by Assaf, and paid by Emirates. Assaf also failed to disclose to Emirates the material fact that the Corporate Defendants were grossly overcharging Emirates on these invoices.

68.     Assaf fraudulently concealed from Emirates these material facts, and he intended that Emirates rely upon his fraudulent concealments, in the pursuit of his and his family members' financial gain.

69.     Emirates would have acted differently had it been aware of these material facts that Assaf concealed with the intent to deceive Emirates and induce the Airline to pay the grossly inflated invoices. Had Assaf disclosed to Emirates these material facts, including his affiliation with the Corporate Defendants, Emirates would have taken steps to prevent losses associated with Assaf's ongoing scheme. This is why Emirates maintains the policies contained in its ERM relating to conflicts of interest and outside business ventures. Furthermore, Emirates would have immediately terminated Assaf's employment had Assaf disclosed these material facts to Emirates.

70.     In addition to concealing material facts relating to his employment with Emirates, Assaf also made numerous misrepresentations to Emirates in furtherance of his fraudulent scheme. For example, when Munjal emailed Assaf on February 15, 2019 asking why there was no address listed on an invoice submitted by Tala Logistics Incorporated, Assaf responded that he "had a word with [Tala Logistics Incorporated] and they confirm they had system error from their side that's why address wasn't on the invoice body" (grammatical errors in original). In reality, there was no

"system error"; Assaf and his family members were just sloppy in the execution of their conspiracy. Assaf made this and other false statements of material facts relating to the nature of his and his family members' associations with the Corporate Defendants to quell suspicions that arose from time-to-time during the Defendants' fraudulent scheme. Furthermore, Assaf made separate material misrepresentations every time he approved an invoice submitted by the Corporate Defendants.

71.     Assaf fraudulently misrepresented to Emirates these material facts, and he intended that Emirates rely upon his misrepresentations, in the pursuit of his and his family members' financial gains.

72.     Emirates reasonably relied on Assaf's fraudulent concealments and misrepresentations, and consequently remitted payment for over 200 grossly inflated invoices that Assaf approved.

73.     Emirates sustained losses and damages as a direct and proximate result of Assaf's fraudulent concealments and misrepresentations.

WHEREFORE, Emirates respectfully requests that this Court award the following relief against Defendant Anwar Assaf:

      a.      Judgment in favor of Emirates;

      b.      Compensatory damages, plus interest, in an amount to be determined at trial;

      c.      Punitive damages in an amount to be determined at trial;

      d.      Emirates' costs incurred as a result of having to file this action, including attorneys' fees, costs, and other expenses incurred; and

      e.      Such further relief as this Court may deem just and proper, in law or equity.

## COUNT IV: VIOLATION OF ILLINOIS' CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1, *et seq.* ("CONSUMER FRAUD ACT") (Asserted Against Defendant Anwar Assaf)

74. Emirates realleges Paragraphs 1 through 53 and 65 through 73 as if fully set forth herein.

75. For over four years, Assaf, while exploiting his employment with Emirates to divert business to the Corporate Defendants, continuously concealed and misrepresented material facts in the conduct of trade and commerce. Specifically, Assaf failed to inform Emirates of the nature of his association with the Corporate Defendants, in breach of his fiduciary duties and in violation of the conflicts of interest and outside business ventures policies contained in Emirates' ERM. Had Assaf disclosed to Emirates his affiliation with the Corporate Defendants, Emirates would have implemented safeguards to protect itself from the losses and damages that Assaf caused it to suffer and, further, would have immediately ceased to employ Assaf.

76. Assaf's brazen scheme to defraud Emirates to the benefit of himself and the other Defendants contravened public policy and caused substantial injury to Emirates, which was ultimately passed down to Emirates' consumers and shareholders. This behavior is exactly the type of unfair and deceptive conduct prohibited by the Consumer Fraud Act.

77. Assaf intended that Emirates rely on his many deceptions and fraudulent omissions.

78. Assaf's unfair and deceptive acts and practices occurred in the course of conduct involving trade and commerce.

79. Emirates sustained losses and damages as a direct and proximate result of relying on Assaf's unfair and deceptive acts and practices.

WHEREFORE, Emirates respectfully requests that this Court award the following relief against Defendant Anwar Assaf:

a.     Judgment in favor of Emirates;

b.     Compensatory damages, plus interest, in an amount to be determined at trial;

c.     Punitive damages in an amount to be determined at trial;

d.     Emirates' costs incurred as a result of having to file this action, including attorneys' fees, costs, and other expenses incurred;

e.     Treble damages as provided by statute; and

f.     Such further relief as this Court may deem just and proper, in law or equity.

**COUNT V: CIVIL CONSPIRACY TO COMMIT FRAUD AND
VIOLATE THE CONSUMER FRAUD ACT**
**(Asserted Against Defendants Anwar Assaf, Nawal Aldraidi, Mohd Assaf, Sabah Said, Tala
Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company)**

80.     Emirates realleges Paragraphs 1 through 53 and 65 through 79 as if fully set forth herein.

81.     As indicated above, Assaf fraudulently concealed from and misrepresented to Emirates several material facts, including his association with the Corporate Defendants. Assaf concealed and misrepresented these material facts from Emirates so the Corporate Defendants could grossly overcharge the Airline, with all the value of the additional inflated costs generated by Assaf's scheme inuring to the benefit of Assaf and his family members.

82.     The nature of the Individual Defendants' acts as described above give rise to an inference that Assaf, Aldraidi, Mohd, Said, and the Corporate Defendants knowingly and voluntarily entered into an agreement to defraud Emirates, in violation of common law and the Consumer Fraud Act. In furtherance of their conspiracy to commit fraud, Aldraidi, Mohd, and Said acted as agents of the Corporate Defendants to obscure the nature of Assaf's involvement with the

23

Corporate Defendants. Assaf would not have been able to defraud Emirates without the concerted and overt acts of Aldraidi, Mohd, Said, and the Corporate Defendants.

83.     Emirates reasonably relied on Assaf's fraudulent concealments and misrepresentations, and consequently remitted payment for over 200 grossly inflated invoices that Assaf approved.

84.     The Defendants intended that Emirates rely on Assaf's many deceptions and fraudulent omissions, and these unfair and deceptive acts and practices occurred in the course of conduct involving trade and commerce.

85.     Emirates sustained losses and damages as a direct and proximate result of the Defendants' conspiracy to defraud Emirates.

WHEREFORE, Emirates respectfully requests that this Court award the following relief against Defendants Anwar Assaf, Nawal Aldraidi, Mohd Assaf, Sabah Said, Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company:

      a.     Judgment in favor of Emirates;

      b.     Compensatory damages, plus interest, in an amount to be determined at trial;

      c.     Punitive damages in an amount to be determined at trial;

      d.     Emirates' costs incurred as a result of having to file this action, including attorneys' fees, costs, and other expenses incurred;

      e.     Treble damages as provided by statute; and

      f.     Such further relief as this Court may deem just and proper, in law or equity.

24

## COUNT VI: BREACH OF FIDUCIARY DUTY OF LOYALTY
### (Asserted Against Defendant Anwar Assaf)

86. Emirates realleges Paragraphs 1 through 53 and 65 through 85 as if fully set forth herein.

87. As a supervisory employee of Emirates holding positions of trust and confidence, Assaf owed the Airline certain fiduciary duties, including the duty of loyalty. Included within the fiduciary duty of loyalty is the duty to act with honesty and in good faith, the duty to avoid self-dealing, and the duty not to usurp corporate opportunities. Further, Assaf was prohibited from acting in a manner inconsistent with the policies contained in Emirates' ERM, including Emirates' policies regarding conflicts of interest and outside business ventures.

88. Assaf abused his positions of trust and confidence to further his and his family members' financial interests, thereby depriving Emirates of profit and advantages in the marketplace.

89. For over four years, Assaf intentionally and without good cause violated the fiduciary duty of loyalty imposed on him as a supervisory employee of Emirates by:

   a. Establishing, operating, and owning the Corporate Defendants without disclosing to Emirates the nature of his association with the Corporate Defendants;

   a. Engaging in clandestine self-dealing by using his authority as Emirates' Cargo Supervisor and Cargo Officer to direct business to the Corporate Defendants for his personal benefit and the benefit of the other Individual Defendants, and to the detriment of Emirates' business interests;

   b. Affirmatively and fraudulently misrepresenting and concealing his involvement with the Corporate Defendants;

     c.       Usurping Emirates' corporate opportunities by failing to disclose business opportunities to Emirates and, instead, diverting the opportunities to the Corporate Defendants; and

     d.       Exploiting his employment with Emirates to approve the payment of invoices for grossly overcharged services purportedly rendered by the Corporate Defendants.

90.     Assaf acted with willfulness and/or malice in breaching his fiduciary duty of loyalty.

91.     Emirates sustained losses and damages as a direct and proximate result of Assaf's wrongful actions described above.

92.     Assaf, who upon information and belief is in possession of the funds that the Corporate Defendants received as a result of the fraudulent scheme, in equity and good conscience should not retain those funds. No remedy at law can adequately ensure that Assaf will not earn a profit flowing from the many breaches of his fiduciary duty of loyalty.

WHEREFORE, Emirates respectfully requests that this Court award the following relief against Defendant Anwar Assaf:

     a.       Judgment in favor of Emirates;

     b.       Compensatory damages, plus interest, in an amount to be determined at trial;

     c.       The imposition of a constructive trust and an accounting of profits for recovery of all income and financial benefits that Assaf received as a result of the breaches of his fiduciary duty of loyalty, including any profits derived therefrom;

d.      Disgorgement of all payments, revenue, profits, monies, and any other benefits derived or obtained by Assaf from his self-dealing and usurpation of corporate opportunities;

e.      The forfeiture of all salary and other compensation paid to Assaf by Emirates for the entire period of his disloyalty;

f.      Punitive damages in an amount to be determined at trial;

g.      Emirates' costs incurred as a result of having to file this action, including the attorneys' fees, costs, and expenses incurred; and

h.      Such further relief as this Court may deem just and proper, in law or equity.

**COUNT VII: AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY**
**(Asserted Against Defendants Nawal Aldraidi, Mohd Assaf, Sabah Said, Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company)**

93.      Emirates realleges Paragraphs 1 through 53 and 65 through 92 as if fully set forth herein.

94.      As a supervisory employee of Emirates, Assaf owed certain fiduciary duties to Emirates, including the duty of loyalty.

95.      As set forth above, Assaf continually breached his fiduciary duty of loyalty for over four years, including by failing to act with honesty and in good faith, by engaging in self-dealing, and by usurping Emirates' corporate opportunities.

96.      At all relevant times, Aldraidi, Mohd, Said, Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company were aware of Assaf's fiduciary obligations to Emirates, knowingly and actively participated in Assaf's many breaches of his fiduciary duty of loyalty, and knowingly accepted the benefits of Assaf's breaches of his fiduciary duty of loyalty.

97. Aldraidi knowingly and substantially assisted Assaf in breaching his fiduciary duties by acting as the owner and agent of both Tala Logistics Incorporated and Tala Logistic Trucking. This allowed Assaf to hide behind the scenes and continue to work for Emirates, in order to put Tala Logistics Incorporated and Tala Logistic Trucking in a position to substantially profit from their business relationships with Emirates.

98. Mohd knowingly and substantially assisted Assaf in breaching his fiduciary duties by acting as an agent of Tala Logistics Incorporated. This allowed Assaf to hide behind the scenes and continue to work for Emirates, in order to put Tala Logistics Incorporated in a position to substantially profit from its business relationship with Emirates.

99. Said knowingly and substantially assisted Assaf in breaching his fiduciary duties by acting as the president of Tala Logistic Company. This allowed Assaf to hide behind the scenes and continue to work for Emirates, in order to put Tala Logistic Company in a position to substantially profit from its business relationship with Emirates.

100. Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company substantially assisted Assaf in breaching his fiduciary duty of loyalty by serving as the means by which Assaf could self-deal and usurp Emirates' corporate opportunities. Assaf knew that the only way he could invoice (and overcharge) Emirates for services purportedly rendered was to have the invoices submitted from vendors that appeared to be legitimate logistics companies.

101. Aldraidi's, Mohd's, Said's, Tala Logistics Incorporated's, Tala Logistic Trucking's, and Tala Logistic Company's aiding and abetting of Assaf's breaches of his fiduciary duties were malicious and/or willful.

102.    Emirates sustained losses and damages as a direct and proximate result of the wrongful actions of Aldraidi, Mohd, Said, Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company.

103.    No remedy at law can adequately ensure that Aldraidi, Mohd, Said, Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company will not earn a profit flowing from Assaf's breach of his fiduciary duty of loyalty.

WHEREFORE, Emirates respectfully requests that this Court award the following relief against Defendants Nawal Aldraidi, Mohd Assaf, Sabah Said, Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company:

a.      Judgment in favor of Emirates;

b.      An order that Aldraidi, Mohd, Said, Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company be held jointly and severally liable for the damages caused by Assaf's breaches of his fiduciary duty of loyalty;

c.      Compensatory damages, plus interest, in an amount to be determined at trial;

d.      Disgorgement of all payments, revenue, profits, monies, and any other benefits that Aldraidi, Mohd, Said, Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company retained as a result of Assaf's breaches of his fiduciary duty of loyalty;

e.      The imposition of a constructive trust and an accounting of profits for recovery of all income and financial benefits that Aldraidi, Mohd, Said, Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company

29

received as a result of the breaches of Assaf's fiduciary duty of loyalty, including any profits derived therefrom;

f.    Punitive damages in an amount to be determined at trial;

g.    Emirates' costs incurred as a result of having to file this action, including the attorneys' fees, costs, and expenses incurred; and

h.    Such further relief as this Court may deem just and proper, in law or equity.

## COUNT VIII: UNJUST ENRICHMENT
**(Asserted Against Defendants Anwar Assaf, Nawal Aldraidi, Mohd Assaf, Sabah Said, Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company)**

104.    Emirates realleges Paragraphs 1 through 53 and 65 through 103 as if fully set forth herein.

105.    For his own benefit, Assaf willfully and continuously breached his fiduciary duty of loyalty by creating the Corporate Defendants and directing Emirates to conduct business with them. Assaf and the other Defendants, in turn, subcontracted work to third parties, then grossly overcharged Emirates for services purportedly rendered. Upon information and belief, the ill-gotten gains from this years-long fraudulent scheme ultimately flowed to Assaf and his family members.

106.    As indicated above, the Individual Defendants actively participated in this conspiracy—with Assaf at the helm—to defraud Emirates. Further, Aldraidi, Mohd, Said, Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company aided and abetted Assaf's breaches of his fiduciary duty of loyalty in furtherance of their scheme to defraud Emirates.

107.    The Defendants knowingly obtained income and financial benefits to which they were not entitled as a result of the conduct described above, including through their tortious acts and breaches of common law duties.

30

108.    By engaging in the acts described above, the Defendants have unjustly enriched themselves at Emirates' expense. Under these circumstances, it would violate the fundamental principles of justice, equity, and good conscience for the Defendants to retain these benefits. No remedy at law can adequately ensure that the Defendants will not be unjustly enriched as a result of their morally wrongful and illegal acts and practices.

109.    Emirates sustained losses and damages as a direct and proximate result of the Defendants' wrongful actions.

WHEREFORE, Emirates respectfully requests that this Court award the following relief against Defendants Anwar Assaf, Nawal Aldraidi, Mohd Assaf, Sabah Said, Tala Logistics Incorporated, Tala Logistic Trucking, and Tala Logistic Company:

a.    Judgment in favor of Emirates;

b.    Disgorgement of all payments, revenue, profits, monies, and any other benefits that the Defendants unjustly retained through their improper activities;

c.    The forfeiture of all salary and other compensation paid to Assaf by Emirates for the entire period of his disloyalty;

d.    The imposition of a constructive trust and an accounting of profits for recovery of all income and financial benefits that the Defendants unjustly retained through their improper activities, including any profits derived therefrom; and

e.    Such further relief as this Court may deem just and proper, in law or equity.

## COUNT IX: BREACH OF CONTRACT
### (Asserted Against Defendant Anwar Assaf)

110.    Emirates realleges Paragraphs 1 through 53 as if fully set forth herein.

111.    In Illinois, an employment relationship is governed by the law of contracts. This is true even in the context of an at-will employment relationship.

112.    Employment handbooks and other policies governing an employment relationship create enforceable contractual terms if the traditional requirements for contract formation are present.

113.    On September 27, 2010, Assaf accepted Emirates' offer of employment and agreed to abide by the terms in the Offer Letter, including: (a) that he would "assist[] the Cargo Manager in the attainment of revenue, tonnage and yield targets in accordance with company standards and directives"; and (b) that he would "not [] disclose any confidential information of Emirates and it[s] subsidiaries and affiliates." See Exhibit 1. Assaf also acknowledged that his "job duties, title, compensation and benefits, as well as Emirates' employment practices, policies and procedures, may change from time to time as determined by Emirates." Id.

114.    After Assaf accepted Emirates' Offer Letter and before he commenced his scheme to defraud Emirates, Emirates communicated to Assaf that he was bound to adhere to additional policies and procedures as terms of his employment, including those contained in Emirates' ERM and the Cargo Officer job description. Emirates reminded Assaf of these policies and procedures at various times throughout his employment with the Airline.

115.    Assaf was aware of the ERM and Cargo Officer job description, and he knew that these documents were part of the terms and conditions of his employment. The policies and provisions contained in Emirates' ERM and the Cargo Officer job description contain such clear

and definitive language that any employee would reasonably believe that they were offered by Emirates as additional terms of employment. Moreover, by informing Assaf of the ERM (including making explicit reference to it in the September 15, 2010 Offer Letter) and by making the ERM available to Assaf through its intranet portal, Emirates disseminated the ERM to Assaf in such a manner that Assaf was aware of its contents and reasonably believed the policies contained therein to be offered by Emirates as additional terms of employment.

116.    Assaf's continued work for Emirates after learning of the ERM and Cargo Officer job description constituted sufficient consideration and acceptance of the policies and terms contained therein, such that they became additional contractual obligations of Assaf's employment relationship with Emirates.

117.    By agreeing to be bound by the ERM—and pursuant to Section C6-1 of the ERM (Emirates' Code of Conduct and Business Ethics)—Assaf knew that he was prohibited from using his "position and authority to further [his] personal interests." See Exhibit 4. Assaf also knew that he "should not become involved in any activity that is likely, directly or indirectly to be in conflict with the company's interest" and that he "should inform [his] HR manager, in writing, of any perceived or potential conflicts of interest." Id. As indicated in Paragraph 35 above, Assaf violated these policies in breach of his contract of employment.

118.    By agreeing to be bound by the ERM—and pursuant to Section C6-6 of the ERM (Emirates' Exclusive Services policy)—Assaf knew that his "employment contract [was] based on the underlying principle that the company [would] be the employee's sole employer." See Exhibit 5. Assaf also knew that he "must not become involved in any activity that is likely, directly or indirectly to be in conflict and competition with the interests of any member company of the Emirates Group," that he was "required to declare any business interests" with a venture "where

33

that venture has, or seeks to have, a working relationship with an Emirates Group company," and that he was to "avoid any actual or perceived conflict of interest" he was required to "[d]eclare in writing to [his] Vice President or Country Manager . . . if [his] or [his] family members are (or become) involved in the operation of any business venture which may be considered to be a conflict of interest" and "[g]ain written approval from the company to participate in the venture." Id. As indicated in Paragraph 37 above, Assaf violated these policies in breach of his contract of employment.

119.    Assaf's and Emirates' contractual employment relationship contained sufficient mutual consideration: Assaf agreed to perform his job duties in accordance with the terms provided by Emirates; in exchange, Emirates agreed to compensate with wages and employment benefits.

120.    For these reasons, there existed a valid, binding, and legally enforceable contract of employment between Assaf and Emirates. The terms of the employment contract included the policies and terms contained in the Offer Letter, the Promotion Letter, Emirates' ERM, the Cargo Officer job description, and other understandings between Assaf and Emirates.

121.    Moreover, implied in the contract of employment was Assaf's duty of good faith and fair dealing;  in Illinois, the duty of good faith and fair dealing requires the party vested with discretion under a contract to exercise said discretion reasonably and with proper motive, and not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

122.    Assaf was afforded a large degree of contractual discretion. Assaf's discretion included, but was not limited to, the ability to: manage third party vendors to provide products and services for Emirates at the lowest available prices; identify opportunities for Emirates' cost reduction; negotiate pricing with vendors; and approve invoices submitted by vendors.

123. Assaf abused this discretion, and his actions were arbitrary, capricious, and contrary to Emirates' reasonable expectations that Assaf act to the benefit of Emirates in carrying out his job responsibilities.

124. Throughout Assaf's employment with Emirates, Emirates performed its contractual obligations, namely, by paying Assaf the wages and benefits it promised to him.

125. Over the four-year period that Assaf engaged in the willful conduct described above in furtherance of his scheme to embezzle funds and defraud Emirates, Assaf repeatedly failed to fulfill various contractual obligations that he promised to perform. Specifically, Assaf intentionally breached his contract of employment in the following ways:

    a. By disclosing Emirates' confidential information to the other Individuals Defendants, in violation of the confidentiality provision of the Offer Letter (*See* Exhibit 1);

    a. By failing to adhere to Emirates' standards and directives, including those regarding relationships with third party vendors and conflicts of interest, in violation of his agreement to abide by the provision in the Offer Letter that he would "assist[] the Cargo Manager . . . in accordance with company standards and directives" (*id.*);

    b. By violating Section C6-1 of the ERM, as indicated in Paragraph 35 above;

    c. By violating Section C6-6 of the ERM, as indicated in Paragraph 37 above;

    d. By purposefully failing to perform the job accountabilities listed in the Cargo Officer job description, including that he would "[p]lan, organise and co-ordinate the operational activities to ensure optimal efficiencies and productivity" (*See* Exhibit 3);

e.      By abusing the discretion he was afforded under his employment contract with improper motives, thereby breaching his implied duty of good faith and fair dealing; and

f.      By otherwise shirking his job responsibilities listed in Paragraph 22 above, including his duty to procure from third party vendors products and services for Emirates at the lowest available prices.

126.    Assaf acted willfully, maliciously, and/or fraudulently in breaching his contractual obligations and implied duty of good faith and fair dealing.

127.    Because of Assaf's many breaches of his contractual obligations and implied duty of good faith and fair dealing, Emirates has been injured, for which it is entitled to recover damages and interest in the amount as the proof at trial may show.

WHEREFORE, Emirates respectfully requests that this Court award the following relief against Defendant Anwar Assaf:

a.      Judgment in favor of Emirates;

b.      Compensatory damages, plus interest, in an amount to be determined at trial;

c.      The imposition of a constructive trust and an accounting of profits for recovery of all income and financial benefits that Assaf received as a result of the breaches of his contractual obligations and implied duty of good faith and fair dealing, including any profits derived therefrom;

d.      Punitive damages in an amount to be determined at trial; and

e.      Such further relief as this Court may deem just and proper, in law or equity.

## **JURY DEMAND**

Emirates demands a trial by jury on all claims so triable as a matter of right.

Dated: December 22, 2020              Respectfully Submitted,

**EMIRATES**

/s/ Jane M. McFetridge
One of Plaintiff's Attorneys

Jane M. McFetridge
J. Casey Leech
JACKSON LEWIS P.C.
150 North Michigan Avenue, Suite 2500
Chicago, Illinois 60601
Telephone: (312) 787-4949
Facsimile: (312) 787-4995
jane.mcfetridge@jacksonlewis.com
casey.leech@jacksonlewis.com